UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GUIDEONE NATIONAL INSURANCE CO.,<br><br>                              Plaintiff,<br><br>              -v-<br><br>SYSTEMS 2000 PLUMBING SERVICE, INC., *et al*.,<br>                              Defendants. | 22-CV-5018 (JPO)<br><br>OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

    This is an insurance coverage dispute arising from a fire in a Manhattan apartment

building in 2021.  Following the fire, a plumbing company that was performing work in the

building, Systems 2000 Plumbing Service, Inc. ("Systems 2000"), faced millions of dollars in

potential liability.  Although Systems 2000's primary insurer, The Travelers Indemnity Company

of Connecticut ("Travelers"), covered the loss up to its $2 million policy limit, its excess insurer,

GuideOne National Insurance Company ("GuideOne"), denied excess coverage based on a

policy exclusion in the Travelers policy for work in residential buildings.  The principal dispute

is whether GuideOne is required to provide coverage to Systems 2000 under the "follow form"

excess policy—either by virtue of Travelers' decision to provide coverage under the primary

policy (through a voluntary "reformation") or based on principles of mutual mistake or illusory

insurance coverage.

    On July 11, 2025, this Court denied the parties' cross-motions for summary judgment,

concluding that genuine disputes of material fact precluded summary judgment on the issues of

mutual mistake and illusory coverage.  (ECF No. 144.)  *See GuideOne Nat'l Ins. Co. v. Systems

2000 Plumbing Serv. Inc.*, No. 22-CV-5018, 2025 WL 1919393 (S.D.N.Y. July 11, 2025).

A bench trial was held from December 8 through December 10, 2025.  The following are the Court's Findings of Fact and Conclusions of Law.

## I.    Findings of Fact

### A.    Background and Overview of the Insurance Policies

Systems 2000 is a plumbing contractor that performs work in apartment buildings in New York City, including condominiums, co-ops, and apartments.  (Santullo Aff. ¶ 7; Tr. 154 (Cordaro).)[1]

On March 23, 2021, a fire occurred at 303 East 37th Street, New York, New York, a co-operative apartment building (the "Co-op").  Systems 2000 had been retained by the "303 E. 37th Owners Corp." and had been performing work replacing isolation valves within the building's plumbing system.  (Cordaro Aff ¶ 5.)  The Co-op is a six-story apartment building containing approximately 80 residential units.

At the time of the fire, Systems 2000 had a primary insurance policy issued by Travelers (the "Primary Policy") with a $2 million limit, and an excess insurance coverage issued by GuideOne (the "Excess Policy") with a $4 million limit.  Both policies were bound and effective as of March 15, 2021, eight days before the fire.  (DX 12; DX 13.)

The Travelers Primary Policy contained an exclusion (the "Residential-Work Exclusion") for "work . . . on or for any project that . . . is . . . any residential condominium [or] any residential apartment . . . ."  (DX 13 at 51.)  The text of the Residential-Work Exclusion was not included in the Primary Policy proposal signed and accepted by Systems 2000 on March 12, 2021.  (DX 16 at 1.)  Rather, the Primary Policy proposal attached a list of "Coverage and

---

[1] "Aff." and "Dec." refer to the witness affidavits and declarations submitted by the parties as direct testimony in advance of the trial.  "Tr." refers to the transcript of the bench trial held on December 8, 9, and 10, 2025.

Amendments" that included only the language "EXC-HAZARD-CONNECTED DESIGNATED EXPOSURE"—a confusingly worded reference to the Residential-Work Exclusion.  (DX 16 at 17.)  Systems 2000 did not receive a copy of the text of the Residential-Work Exclusion until March 31, 2021, eight days after the fire.

The Excess Policy issued by GuideOne to Systems 2000 was a "follow form" excess policy, meaning that its terms followed the terms of any policy scheduled in the underlying Primary Policy.  It was "subject to the same terms, conditions, provisions, limitations, exclusions and definitions" of the listed Travelers Primary Policy.  (DX 12 at 8.)  The Excess Policy also included a clause reserving GuideOne's "right to refuse to follow any . . . change [made after the inception date of the policy] to the Scheduled Underlying Insurance, in which event this policy shall apply as if the changes had not been made."  (*Id*. at 10.)

After the March 23, 2021 fire at the Co-op, Systems 2000 began facing claims in the millions of dollars.  Travelers initially denied coverage under the Primary Policy based on the Residential-Work Exclusion.  Upon further review, Travelers decided to cover Systems 2000 for those claims, "reforming" the policy by removing the Residential-Work Exclusion.  GuideOne, however, maintained its position that it was not obligated to cover the claims under the Excess Policy.

### B.    Procedural Background

GuideOne filed the original complaint in this action on June 16, 2022, seeking a declaration that it is not obligated to indemnify or defend Systems 2000 for losses from the March 23, 2021 fire.  (ECF No. 2.)  In the complaint, GuideOne named Systems 2000, the corporation that owns the Co-op, the individual owners, and the subrogees of the individual owners.  (*Id.*)  Systems 2000 filed an answer, including counterclaims, on August 12, 2022.  (ECF No. 4.)  Systems 2000 also filed a third-party complaint against Travelers and BNC

Insurance Agency, Inc. ("BNC") on August 26, 2022, asserting negligence and related claims. (ECF No. 5.) GuideOne then filed an amended complaint on December 15, 2022 (ECF No. 25), and Systems 2000 filed an amended answer on February 23, 2023 (ECF No. 69).

Discovery was completed in August 2024. (ECF No. 118.) The parties then filed cross-motions for summary judgment, which this Court denied on July 11, 2025. (ECF No. 144.) *GuideOne*, 2025 WL 1919393.

On November 3, 2025, the parties filed their proposed Joint Pretrial Order (ECF No. 148), which the Court has signed and so-ordered (ECF No. 164).

A final pretrial conference was held on December 1, 2025. During that conference, the parties agreed that resolution of the principal dispute between GuideOne and Systems 2000—whether GuideOne is required to cover Systems 2000 under the Excess Policy for the March 2021 fire loss—may render moot the various other claims involving Travelers and BNC. Accordingly, the Court ordered a bifurcated bench trial, with the first phase addressing that principal issue and a second phase to follow if necessary.

### C.    The Travelers Primary Policy

As of early 2021, BNC, an insurance broker, had worked with Systems 2000 to procure coverage for Systems 2000's work for approximately twenty years. During that period, Systems 2000 had been insured by Harleysville Insurance Company ("Harleysville"), which provided both primary and excess coverage (as of 2020, $1 million in primary and $5 million in excess coverage). The Harleysville policies issued over those two decades did not include any exclusions for work in residential buildings. (Bartolini Aff. ¶¶ 4-6; Cordaro Aff. ¶ 6; Tr. 155-56, 171 (Cordaro).)

In late 2020, Systems 2000 learned that Harleysville was non-renewing Systems 2000's coverage for the March 15, 2021–March 15, 2022 policy term. (Tr. 156 (Cordaro).) Beginning

in January 2021, Systems 2000's broker, Janine May Bartolini ("Bartolini") of BNC, working with Desiree Cordaro ("Cordaro") of Systems 2000, sought out replacement primary and excess insurance for Systems 2000. Bartolini prepared an insurance submission packet, which it sent to other insurers, seeking auto, general liability, and excess insurance for System 2000, to be effective on March 15, 2021.

On February 9, 2021, Bartolini sent Systems 2000's insurance submission to Grant Busch ("Busch") of Travelers. The submission included the following documents, among others: GL Acord Application; $5M Umbrella Application; GL & Umbrella loss runs from 2015-2021; Work in Progress list; and AI Endorsement List. (DX 26; Tr. 391 (Busch).) Although Busch initially declined to offer to write insurance for Systems 2000, Travelers reconsidered, and Busch subsequently informed Bartolini that Travelers was interested in providing insurance. (Tr. 400 (Busch).)

On March 12, 2021, Bartolini forwarded to Cordaro the Travelers Primary Policy proposal (the "Travelers Proposal"). (DX 16; Tr. 172 (Cordaro).) The signature page stated, "Please bind this proposal effective 3/15/2021 per the coverage and conditions described above." (DX 16 at 3.) The Travelers Proposal did not contain the text of the Residential-Work Exclusion. It did contain a page entitled "Coverage and amendments" that included the language "EXC-HAZARD-CONNECTED DESIGNATED EXPOSURE." (DX 16 at 17.) The Travelers Proposal had an annual premium of $175,193 for general liability coverage, which was substantially higher than Systems had previously paid to Harleysville. (Tr. 173-74 (Cordaro).) Busch was not involved in the preparation of the Travelers Proposal. (Tr. 380 (Busch).)

Cordaro signed the Travelers Proposal on behalf of Systems 2000 on March 12, 2021, returning the signed proposal to Travelers via BNC on the same date.  (DX 16 at 1; Tr. 174 (Cordaro).)

Travelers' risk management team subsequently conducted a risk analysis of Systems 2000 and prepared a risk control report.  The report, dated April 9, 2021, stated: "Contractor [Systems 2000] focuses on the following major categories of work: Apartments, condominiums, low-rise, high-rise"; it further stated that "100 percent" of Systems 2000's work was "residential."  (DX 44; Tr. 438-39 (Busch); DX 17.)  The Travelers Primary Policy was contingent on the result of this report, meaning that Travelers could rescind the policy within 60 days of its issuance if it found that there had been any material misrepresentation by the insured.  It never rescinded the policy.  (Tr. 444 (Busch).)

On March 31, 2021, eight days after the fire, Cordaro received a copy of the complete Travelers Primary Policy, which included, for the first time, the language of the Residential-Work Exclusion:

> Exclusion—All Hazards in Connection With a Designated Exposure
>
> Description:
>
> "Your work" on or for any project that, in whole or in part, is or will become any single- or multi-family housing, any residential condominium, any residential apartment or any assisted living facility."

(DX 13 at 51; Tr. 176 (Cordaro).)  This was a Travelers-specific exclusion, not a form exclusion used in the industry.  (Tr. 436-37 (Busch); Tr. 280 (Schiavone).)

D.    **The GuideOne Excess Policy**

While working to obtain a primary policy for Systems 2000, BNC was simultaneously working to procure excess insurance for Systems 2000.  On January 13, 2021, Bartolini, of BNC, emailed Joseph Rossitto ("Rossitto"), of RT Specialty, a wholesale broker, advising him that she was seeking to place excess coverage for Systems 2000.  Her email to Rossitto stated that "Client is a plumbing contractor for apartment buildings in NYC - contracted by the building owner." (DX 2.)  Attached to the email was a Commercial Insurance Application that Bartolini had completed on behalf of Systems 2000.  Under the description of "primary operations," the application stated that Systems 2000 was a "PLUMBING CONTRACTOR/COMMERCIAL APARTMENT BUILDINGS."  (DX 2 at 4.)

Bartolini emailed Rossitto again on February 9 and February 17, 2021, requesting excess insurance for Systems 2000.  In these emails she described Systems 2000 as a "plumbing contractor in NYC" that does "general plumbing repairs, replacement, and upgrade of plumbing piping systems for building owners."  (PX 9; DX 3.)  The application attached to the emails described Systems 2000's "primary operations" as "PLUMBING CONTRACTOR – GENERAL PLUMBING REPAIRS, REPLACEMENT AND UPGRADE OF PLUMBING PIPING SYSTEMS."  It attached a "Work in Progress Schedule," which listed four apartment buildings in Manhattan:  "61 E 86TH ST"; "401E86TH ST"; "10 E 85 ST"; 235w102 ST."  (PX 9 at 32.) The application also referenced several apartment buildings as "AIs" (additional insureds). [2]

---

[2] These included "13-21 East 22nd Street Residence Corp"; "Amalgamated Warbasse proj[ect]"; and "1020 Park Avenue."  (PX 9 at 9, 16.)  There was also a reference to "board of education of the city school" as an "AI."  (PX 9 at 9.)  Although the latter would appear to suggest one example of Systems 2000 doing work in non-residential buildings, Santullo and Cordero testified credibly that this was a potential project for a Systems 2000 estimator that was never approved or performed.  (Tr. 123-27 (Santullo); Tr. 233-34 (Cordaro).)

On February 26, 2021, Bartolini again emailed Rossitto, attaching a completed "Contractor's Questionnaire." (DX 6.) Under "description of operations," the Contractor's Questionnaire stated that Systems 2000 was a "plumbing contractor - commercial apartment buildings." The response to question number 36 of the questionnaire stated that upcoming work would involve construction of, or involvement with, condominiums or townhouses and that the work would be done for Homeowners Associations. The response to question 38 of the questionnaire stated that "upcoming work would involve the construction of or involvement with apartments." (DX 6 at 9.) The body of Bartolini's email addressed a prior loss and a settlement with "Fairmont Tenants Corp.," explaining that an individual had been injured "by her front door" and when "she fell outside her apartment." (DX 6 at 1.)

On March 12, 2021, after Travelers had issued the Travelers Proposal for primary coverage, Bartolini sent another email to Rossitto, attaching the Travelers Proposal and advising that Systems 2000 still needed $4 million in excess coverage. (DX 4.)

Derek Schiavone ("Schiavone") was GuideOne's Head of Excess and Surplus Casualty in 2021. Schiavone managed the "CERT"—"Construction Excess by RT"—program for GuideOne. (Tr. 248-49 (Schiavone).) GuideOne had begun providing excess insurance under the CERT program in November 2020. The CERT program was designed to provide excess insurance to "New York contractors," including commercial plumbers doing work in residential properties. (Tr. 250-51 (Schiavone).) RT Specialty drafted the CERT guidelines and proposed insurance under the program, but any decision to write insurance was subject to the approval of GuideOne, and specifically Schiavone. (Tr. 251 (Schiavone).) A CERT program overview listed "class codes that would be acceptable risks in the program," including ISO code 98482, "Plumbing—Commercial and Industrial," and ISO code 98483, "Plumbing—Residential or

Domestic."[3]  (Tr. 258-59 (Schiavone); DX 1 at 42.)  Both classifications were rated "L" for "low risk."  (Tr. 260 (Schiavone); DX 1 at 42.)

On March 12, 2021, Gregory Heinssen, an underwriter at RT Specialty, emailed Schiavone, proposing terms for a GuideOne policy to be issued to Systems 2000.  In his email, Heinssen described Systems 2000 as a "Plumbing Contractor working in the NYC area on commercial apartment buildings" and "a contractor that fits within the CERT guidelines."  (DX 8 at 2.)  Schiavone understood the reference to "commercial apartment buildings" to mean "an apartment building, not like a single family home, a building where people were living."  (Tr. 264 (Schiavone).)  The email included a bullet point describing Systems 2000's work as "100 percent commercial apartment buildings, remodel/repair."  (DX 8 at 2.)  Schiavone understood this to mean that "[a]ll of that work was performed on commercial apartment buildings, buildings where people were living, and they were performing work that was remodel or repair work."  (Tr. 265 (Schiavone).)  Heinssen's email included a proposed annual premium of $120,451 and attached "our CERT Risk summary," as well as "historical exposures" and "loss summaries."  (DX 8 at 2.)  Schiavone also received the application and "work in progress" schedule—listing four Manhattan apartment buildings—that Bartolini had sent to Rossitto in February.  (Tr. 276-77 (Schiavone).)

At his deposition, Heinssen testified that he understood Systems 2000 to be a "plumbing contractor" that did work in "commercial apartment buildings."  (Heinssen Dep. 97, *see also id.* at 98-102, 116.)  His understanding of the term "commercial apartment building" was that it referred to "work for the building owner" in "apartment buildings."  (*Id.* at 44.)  He was not

---

[3] "ISO" refers to "Insurance Services Office, Inc.," which has developed a classification code system for the insurance industry.  *See Inter-Reco, Inc. v. Transcorp Const. Corp.*, 12 N.Y.S. 3d 265, 266 (2d Dep't 2015).

aware of any residential-work exclusion in the Travelers Primary Policy when he proposed the Excess Policy to GuideOne. (*Id.* at 89, 111-12, 154.) Heinssen "didn't have any hesitation" in recommending excess coverage to GuideOne for "a contractor who was doing work in commercial apartment buildings." (*Id.* at 53.)

On March 15, 2021, Schiavone approved the proposed excess coverage for Systems 2000 on behalf of GuideOne, stating in an email to Heinssen, "OK per our conversation and your referral." (DX 8 at 1; Heinssen Dep. 119-20; Tr. 270 (Schiavone).) Based on his review of the documents sent by Heinssen, Schiavone knew at the time of his decision that Systems 2000 performed work in "commercial apartment buildings" and considered it an "acceptable risk." (Tr. 271, 275 (Schiavone).) Indeed, Schiavone testified that the quoted premium—$121,326, including fees and taxes—"would have been lower" if the insured's work was only in "non-residential properties" due to the higher risk associated with buildings where people live. (Tr. 275-76 (Schiavone).) Schiavone's intent at the time he approved the quote on behalf of GuideOne was "[t]o cover [Systems 2000's] work as a plumber, doing plumbing work in apartment buildings." (Tr. 276 (Schiavone).) He intended to provide "excess coverage over Travelers for a plumber performing work in apartment buildings, residential buildings, could be co-ops, condos, where people live." (Tr. 296 (Schiavone).) He never discussed a residential-work exclusion with anyone at RT Specialty and never considered such an exclusion in connection with the Excess Policy. (Tr. 286, 292-93 (Schiavone).) He would not have included a residential-work exclusion in the Excess Policy because "[t]hat would have excluded coverage for [Systems 2000's] entire operation" (Tr. 287-88 (Schiavone)) and such an exclusion would have resulted in "no coverage" for Systems 2000 (Tr. 295 (Schiavone)).

Neither Schiavone nor anyone at GuideOne had any communications with Travelers or BNC before issuing the Excess Policy, nor did they rely on the Travelers Proposal or the Travelers underwriting process in deciding to issue the Excess Policy.  (Tr. 273, 280 (Schiavone).)

GuideOne issued the Excess Policy to Systems 2000, effective March 15, 2021.  (DX 12.)

The Excess Policy issued by GuideOne to Systems 2000 was a "follow form" excess policy, meaning that its terms followed the terms of any policy scheduled in the underlying Primary Policy.  It was "subject to the same terms, conditions, provisions, limitations, exclusions and definitions" of the listed Travelers Primary Policy.  (DX 12 at 8.)  The Excess Policy also included a clause reserving GuideOne's "right to refuse to follow any . . . change [made after the inception date of the policy] to the Scheduled Underlying Insurance, in which event this policy shall apply as if the changes had not been made."  (*Id*. at 10.)

Shortly after the Excess Policy was bound, Applied Risk, a third-party risk management service, conducted a risk review for RT Specialty, reviewing documents and interviewing Cordaro of Systems 2000 on March 19, 2021.  (DX 11 at 2.)  Its report, which was provided to RT Specialty on March 23, 2021, stated:

> The insured [Systems 2000] is a prime contractor working directly for the building owner, upgrading their plumbing services.  **A significant [sic] of their work is for the condo board, replacing or upgrading the plumbing services throughout the building**. . .
> . . . .
> 100% of their work is commercial business for condos, co-ops and commercial spaces.  No public or government work is performed.
> . . . .
> The largest job completed in recent years was a $1.9 million for a condo building located at 401 East 86th Street, NYC.

DX 11 at 6 (bold in original).  Although the review was conducted after the Excess Policy was bound, GuideOne had the ability to cancel coverage if the review revealed a material

misrepresentation of the risk that it had agreed to insure.  (Tr. 289 (Schiavone).)  GuideOne

never cancelled the policy or raised any concern about its understanding of Systems 2000's work

as a result of the Applied Risk report.  (Tr. 291 (Schiavone).)

### E.    The Insurers' Coverage Decisions

Following the March 23, 2021 fire at the Co-op, Systems 2000 submitted claims to both

Travelers and GuideOne.  Travelers initially denied coverage on April 27, 2021, based on the

Residential-Work Exclusion.  Then, on June 28, 2021, Travelers unilaterally "reformed" the

Primary Policy to "delete" the Residential-Work Exclusion and rescinded its previous denial of

coverage.  As a result, Travelers agreed to pay for Systems 2000's liability up to the $2 million

policy limit.  (DX 22; DX 28.)

GuideOne was informed of Travelers' initial declination of coverage and its subsequent

decision to rescind its declination under the Primary Policy.  (Pearson Aff. 2-3.)  Following the

rescission of the declination by Travelers, GuideOne requested a "coverage opinion" from its in-

house counsel.  (DX 29; Pearson Aff. 3.)  GuideOne disclaimed coverage on November 23,

2021, on the ground that Travelers' reformation was a "change" that GuideOne was not

obligated to follow under the Excess Policy.  (DX 15; Pearson Aff. 3-4.)

### F.    Ultimate Findings on Dispositive Issues

#### 1.    Systems 2000's Work

The evidence clearly and convincingly established that, as a factual matter, all of the

work that Systems 2000 did was work in residential buildings—*i.e.*, work in condominiums, co-

ops, and apartment buildings in New York City.  That was the clear and consistent testimony of

Santullo and Cordaro, the only witnesses with direct knowledge of the issue, and Bartolini, the

retail broker who had worked with Systems 2000 for two decades in obtaining insurance.  This

was also clearly established by the documentary evidence, including the insurance applications,

the risk analyses performed on behalf of Travelers and GuideOne, emails (which referenced a prior claim involving an "apartment" building), the additional-insured schedules, and the "work in progress" schedules, which listed exclusively residential apartment buildings.  There was no evidence at trial that Systems 2000 performed any work other than work in residential buildings.[4]  Thus, the evidence was ultimately undisputed that one hundred percent of Systems 2000's work was work in residential buildings, including condominiums, co-ops, and apartment complexes.

Systems 2000's work was on building-wide plumbing systems—hence the multiple references to "owners corporations," "tenants corporations," and "co-op boards" as clients—rather than work servicing individual residents' plumbing needs (like repairing Apartment 12-F's leaky faucet).  Thus, although Systems 2000 was engaged in "commercial plumbing" services rather than "residential plumbing" services in terms of the type of work it performed, its work was nevertheless entirely in residential buildings.  (Tr. 148-49 (Santullo); Tr. 167-68, 169 (Cordaro).)

Given its plain language and breadth, the Residential-Work Exclusion—which excluded "work . . . on or for any project that . . . is . . . any residential condominium [or] any residential apartment" (DX 13 at 51)—would have excluded coverage for all of Systems 2000's work.  *See GuideOne*, 2025 WL 1919393, at *4 n. 5, *6.

## 2.    GuideOne's Knowledge and Intent

The Court finds by clear and convincing evidence—indeed, beyond any genuine dispute—that GuideOne knew that Systems 2000 performed its work in residential buildings and

---

[4] As noted above, while an additional-insured schedule contained a single reference to a project on a "school," this was work that Systems 2000 never in fact approved or performed.  *See supra* note 2.

intended to provide coverage for such work at the time it issued the Excess Policy. The sole witness from GuideOne who testified at trial, Schiavone, was also its decisionmaker on issuing the Excess Policy. The Court finds Schiavone to have been quite credible as a witness.[5] Schiavone's testimony was entirely clear and consistent: He—and therefore GuideOne— intended "[t]o cover [Systems 2000's] work as a plumber, doing plumbing work in apartment buildings." (Tr. 276 (Schiavone).) His intent was to provide excess coverage "for a plumber performing work in apartment buildings, residential buildings . . . co-ops, condos, where people live." (Tr. 296 (Schiavone).) In fact, Schiavone testified that he understood the quoted premium for the Excess Policy to be higher *because of the fact* that Systems 2000's work was in residential buildings, and that testimony was unrebutted. (Tr. 275-76 (Schiavone).) He also understood the references to "commercial apartment buildings" in certain documents to be no different from "residential apartment buildings." (Tr. 325 (Schiavone).)[6]

Schiavone's testimony on this score is buttressed by the overwhelming evidence that GuideOne was informed of Systems 2000's work in residential buildings. This includes:

- Bartolini's emails to RT Specialty, the first of which described Systems 2000 as "a plumbing contractor for apartment buildings in NYC - contracted by the building owner" (DX 2)

---

[5] Although counsel for GuideOne attempted to undermine Schiavone's credibility, that effort was unavailing. Counsel pointed out Schiavone's initial lack of recollection of certain facts during his deposition. (Tr. 300-03 (Schiavone).) It is clear to the Court, however, that in both his deposition and his trial testimony, Schiavone's recollection was refreshed by reviewing the relevant documents and his subsequent testimony was clear, consistent, and credible.

[6] Heinssen, RT Specialty's underwriter who communicated with Schiavone about the Excess Policy, did not testify at trial, but portions of his deposition testimony were admitted. Because Schiavone was the decisionmaker for GuideOne, Heinssen's knowledge and intent are not relevant except insofar as they shed light on Schiavone's knowledge and intent. Heinssen agreed, however, that the term "commercial apartment building" referred to "work for the building owner" in "apartment buildings." (Heinssen Dep. at 44.)

- The insurance application's works-in-progress schedule, which listed four apartment buildings (PX 9)

- The insurance application's additional-insureds schedule, which listed multiple apartment buildings and co-op associations (PX 9)

- The Applied Risk report, which stated that "100% of [Systems 2000's] work is commercial business for condos, co-ops and commercial spaces" (DX 11 at 6)

- RT Specialty's March 12, 2021 email to Schiavone, which stated that Systems 2000 was a "Plumbing Contractor working in the NYC area on commercial apartment buildings" and "a contractor that fits within the CERT guidelines" (DX 8 at 2)

- The quoted excess insurance premium of $121,326, which Schiavone understood to be higher because it reflected coverage for work in residential buildings (DX 8; Tr. 275-76 (Schiavone)

- The CERT program itself, which was designed to provide excess insurance to New York contractors, including commercial plumbers doing work in residential buildings (DX 1 at 42; Tr. 250-51, 258-60 (Schiavone))

None of the documents submitted to GuideOne included or referred to an exclusion for residential work, in either the GuideOne policy or the underlying Travelers policy.  Nor did Schiavone have any communications with anyone at Travelers about the Primary Policy.  Whatever intent Travelers may have had about the Primary Policy is therefore irrelevant to GuideOne's intent with respect to the Excess Policy.[7]

In short, GuideOne plainly knew that Systems 2000 did work in residential buildings in New York City and intended to insure the risk for that work.

---

[7] GuideOne asks the Court to find that its intent was merely to "follow form"—that is, to provide excess coverage for whatever the primary policy covered, no more and no less.  (Tr. 506-07.)  But the evidence shows clearly and convincingly that GuideOne *did* have a specific intent to cover work in residential buildings.  The more modest finding on intent that GuideOne prefers is not supported by the evidence.  Moreover, even if it were true that GuideOne's principal "intent" was to "follow form," it remains clear that GuideOne *knew* that the insured's work was in residential buildings, so there was nevertheless (1) a mutual mistake about what was being covered, and (2) illusory coverage if all residential work was excluded.

### 3.     Systems 2000's Knowledge and Intent

The Court finds by clear and convincing evidence that Systems 2000 intended to obtain excess coverage for its work in residential apartment buildings and understood that the Excess Policy issued by GuideOne provided coverage for such work.

There is no dispute as to Systems 2000's *intent* to obtain insurance—both primary and excess—that would provide general liability coverage for its work in residential buildings effective March 15, 2021.  That was established by the clear and consistent testimony of Santullo, Cordaro, and Bartolini and was supported by all the documentary evidence.

The only disputed question concerns Systems 2000's *knowledge*—specifically, whether Systems 2000 knew that residential work would be excluded from coverage under the Excess Policy.  Apparently recognizing the lack of evidentiary support for its position, GuideOne contends that Systems 2000's knowledge should be analyzed as follows:  (1) Systems 2000 knew (or should have known) that residential work would be excluded under the Primary Policy; (2) that knowledge carried forward to the "follow form" Excess Policy; and (3) therefore, there was no "meeting of minds" between GuideOne and Systems 2000 to establish a mutual mistake.  GuideOne's argument fails for a number of reasons.

First, as between Systems 2000 and GuideOne, all the evidence establishes that both parties had the same knowledge and intent: to provide excess coverage for Systems 2000's work, with a full understanding that that work was performed in residential apartment buildings.  The notion that Systems 2000 contemplated—much less knew—that residential work would be excluded is belied by the communications and documents submitted by Systems 2000 to GuideOne, replete with references to "apartment buildings," "co-ops," "condos," and specific projects in residential apartment buildings.  *See supra* section I.F.2.  Those documents were prepared by Bartolini, working with Systems 2000, and reveal no effort to hide or obscure the

fact that Systems 2000's work was performed in residential buildings.  The unrefuted testimony of Santullo, Cordaro, and Bartolini, which the Court finds credible, also establishes that Systems 2000 in fact understood its agreement with GuideOne to entail coverage for work in residential buildings—and that excluding such work would have resulted in no coverage at all.  Based on all the evidence, the only plausible inference is that Systems 2000, like GuideOne, understood that the Excess Policy insured Systems 2000 for work in residential buildings.

Second, even indulging GuideOne's indirect chain of reasoning involving Systems 2000's interactions with Travelers, the Court arrives at the same conclusion about Systems 2000's knowledge.  As with GuideOne, Systems 2000's submission to Travelers described it as a "plumbing contractor in NYC" that does work on "plumbing piping systems for building owners," and included references to co-ops and apartments in New York City as additional insureds and works in progress.  (DX 26.)  As with GuideOne, the testimony of Santullo, Cordaro, and Bartolini credibly establishes that they understood the Travelers policy to be providing insurance for Systems 2000's work in residential buildings.  The evidence reveals no effort to hide the nature of Systems 2000's work in its correspondence with Travelers.

The only significant factual dispute relates to a telephone call among Cordaro, Bartolini, and Grant Busch of Travelers that took place on March 6, 7, or 8, 2021.  All three witnesses testified that, on the call, Cordaro discussed Systems 2000's work in apartment buildings. Busch, however, recalled that work being conveyed to him as "incidental" and "in common areas" of apartment buildings.  (Tr. 371-72, 408 (Busch).)  Busch also testified that he informed Cordaro and Bartolini that "the policy included a residential exclusion, therefore we would need to schedule exclusions for residential work on a project specific basis."  (Busch Dec. ¶ 5; Tr. 377 (Busch).)  Both Cordaro and Bartolini denied that Busch ever mentioned an exclusion for

residential work; they also denied that they had characterized Systems 2000's work as "incidental."  (Bartolini Aff. ¶ 10; Tr. 474 (Bartolini); Cordaro Aff. ¶ 15; Tr. 203 (Cordaro).) Cordaro was adamant, calling Busch's testimony "one hundred thousand percent" false.  (Tr. 204 (Cordaro).)

The Court credits the testimony of Cordaro and Bartolini on this issue.  Cordaro, in particular, was a notably credible and intelligent witness who provided consistent and reliable testimony.

Although Busch was largely credible on several subjects, the Court finds him to have been not fully reliable on this subject.  As of early 2021, Busch had recently started at Travelers in a junior role, as an associate account executive, and had completed a nine-month training program.  (Tr. 385 (Busch).)  He was working remotely due to the Covid pandemic and had recently moved from his parents' home.  (Tr. 386-87 (Busch).)  Busch did not review certain portions of the Systems 2000 submission, including the works in progress, and he reviewed the loss history only after Travelers had decided to write coverage.  (Tr. 400, 405 (Busch).)[8]  Particularly after the fire, when Travelers began "looking into whether or not there was a meeting of the minds in relation to residential work" (DX 43 at 1), Busch was understandably motivated to act in a way that he perceived to be in his employer's interests.[9]  Although the Court does not find that Busch

---

[8] Upon reviewing the works in progress and loss runs after the fact at trial, Busch acknowledged that it was clear that Systems 2000 primarily did work in residential buildings. (Tr. 432 (Busch).)

[9] Busch's notes regarding the underwriting process were placed in a "U-doc" file which was created after the fire.  The document was not created until March 29, 2021, and apparently was revised thereafter.  (Tr. 403, 422-23, 445-46 (Busch).)  Busch did not provide the document to Mike Machado of Travelers until May 21, 2021 (DX 25), a month after Machado had requested it (DX 43).  After the fire, Busch stated in an email on April 16, 2021 that he understood Systems 2000 to be a "plumbing contractor who installs/repairs risers, valves, drains,

intentionally testified falsely, it finds that his testimony about the March call with Cordaro and Bartolini was colored by his limited experience, his less-than-complete diligence on the underwriting file, and his role at Travelers.[10]  What happened on the call, the Court finds, is that Busch did not fully understand Cordaro's explanation of Systems 2000's work and conflated the distinction between "commercial plumbing" and "residential plumbing" with that between "commercial buildings" and "residential buildings."  The Court finds it utterly incredible that Cordaro somehow misled Busch to believe that Systems 2000's work was done in commercial buildings, particularly in light of (1) Systems 2000's submission, which clearly revealed system-wide work in residential buildings, and (2) Cordaro's credible testimony.  Similarly, the Court finds that Busch did not state on the call that there would be a "residential exclusion" in any sense that would have excluded all of Systems 2000's work—a nonstarter for Systems 2000.

### 4.    Mutual Mistake and Illusory Coverage

Based on the above findings, the Court finds by clear and convincing evidence that there was a mutual mistake between Systems 2000 and GuideOne as to the scope of coverage under the Excess Policy at the time the policy was bound.  Specifically, both Systems 2000 and GuideOne understood, intended, and agreed to an excess insurance policy that covered Systems

---

etc. within commercial spaces and doing some work within condos and apartments" and that "[i]t was not my intent to offer coverage on any residential work that I was unaware of, like the claim that arose."  (DX 43 at 2.)

[10] As one example, when confronted with the name "1435 Tenants Corp" on an additional-insured schedule, Busch resisted the conclusion that the name suggested a residential co-op apartment building, stating, "A tenant could be a Target leasing a space from Cushman & Wakefield."  (Tr. 416 (Busch).)  (*Cf.* Tr. 282-83 (Schiavone acknowledging that "Fairmont Tenants Corp" likely referred to an "apartment building").)

2000's work in residential apartment buildings, which constituted the entirety of Systems 2000's work. At the time of the parties' binding agreement, neither party had seen language reflecting an exclusion for work in residential buildings or understood such an exclusion to be part of the policy. When the parties later saw the Residential-Work Exclusion in the Primary Policy, which nominally carried forward to the Excess Policy, that exclusion, if applied by its terms, would have rendered the Excess Policy flatly inconsistent with Systems 2000's and GuideOne's mutual knowledge and intent. Neither Systems 2000 nor anyone acting on its behalf engaged in any deception or misrepresentation that would make it inequitable to reform the Excess Policy in favor of the insured. Because all of Systems 2000's work was performed in residential buildings, enforcement of the Residential-Work Exclusion would result in no coverage for the entirety of the insured's work, thus providing illusory coverage. For the same reasons, the only remedy that would give effect to Systems 2000's and GuideOne's mutual agreement with respect to the Excess Policy is to strike the Residential-Work Exclusion insofar as it would otherwise apply.

## II.    Conclusions of Law

### A.    Subject Matter Jurisdiction

This Court has subject matter jurisdiction under the diversity-of-citizenship statute, 28 U.S.C. § 1332(a)(1). The complaint alleges, and the parties do not dispute, that Plaintiff GuideOne is a citizen of Iowa, where it is incorporated and has its principal place of business, and Defendants are citizens of New York, Connecticut, Illinois, Ohio, and Texas. (ECF No. 2 ¶¶ 1-23.) The amount in controversy exceeds $75,000, exclusive of interest and costs. (*Id*. ¶ 23.)

### B.    Governing Law

The parties agree that New York law applies to the claims in this case. (*See* DX 13 at 12, 52, 54, 66, 67, 71 (Travelers Primary Policy referencing New York law); DX 12 at 8-9

(GuideOne Excess Policy not specifying choice of law but following terms of primary policy); ECF No. 149 at 6-7; ECF No. 151 at 7-11; ECF No. 154 at 5-7 (parties' proposed conclusions of law applying New York law). "Where the parties agree that New York law controls, this is sufficient to establish choice of law." *Federal Ins. Co. v. American Home Assured Co*., 639 F.3d 557, 566 (2d Cir. 2011). Accordingly, the Court applies New York law.

### C.    Application of New York Law

#### 1.    Mutual Mistake

Under New York law, the remedy of "reformation is available in cases of . . . mutual mistake." *AMEX Assurance Co. v. Caripides*, 316 F.3d 154, 161 (2d Cir. 2003). "Reformation is not granted for the purposes of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes the agreement is at variance with the intent of both parties." *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 219 (1978). "In a case of mutual mistake, the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement." *Chimart Associates v. Paul*, 66 N.Y.2d 570, 573 (1986). "[R]eformation based upon mistake is not available where the parties purposely contract based upon uncertain or contingent events." *Id.* at 574 (citation omitted). "[T]he court may reform an unambiguous policy if, due to mutual mistake, the writing does not reflect the mutual intention of the parties at the time of the agreement." *St. Paul Fire & Marine Ins. Co. v. Royal Ins. Co. of Am.*, No. 91-CV-6151, 1994 WL 167943, at *3 (S.D.N.Y. May 2, 1994). "Where there is mutual mistake, parol evidence may be introduced to prove the actual agreement of the parties." *Id.*; *see also Capparelli v. Vitiritti*, 643 N.Y.S.2d 656, 658 (1996) ("[P]arol evidence is admissible to reform a contract on the basis of mutual mistake.").

"The proponent of reformation must 'show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties.'" *Chimart*, 66 N.Y.2d at 573 (quoting *George Backer Mgmt. Corp.*, 46 N.Y.2d at 219).  Mutual mistake must be demonstrated by "clear and convincing evidence" in order to "avoid the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different contract." *Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 495-96 (S.D.N.Y. 2004) (citing *Chimart*, 66 N.Y.2d at 574; and *Collins v. Harrison-Bode*, 303 F.3d 429, 435 (2d Cir. 2002)).  The heightened evidentiary requirement "operates as a weighty caution upon the minds of judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." *George Backer Mgmt. Corp.*, 46 N.Y.2d at 220 (citation omitted).

Applying these principles, and based on the Findings of Fact set forth above, the Court concludes there was a mutual mistake between Systems 2000 and GuideOne as to coverage under the Excess Policy.  As explained in the Findings of Fact, clear and convincing evidence at trial established that both parties agreed to an excess policy providing coverage for Systems 2000's work in residential apartment buildings, which was the entirety of Systems 2000's work. This is not a situation involving merely a "hard or oppressive bargain" or a "contract based upon uncertain or contingent events."  Nor is the evidence "loose, equivocal, or contradictory." Rather, it is clear that "the writing that memorializes the agreement is at variance with the intent of both parties." *George Backer Mgmt. Corp.*, 46 N.Y.2d at 219.  Systems 2000 has also proven by clear and convincing evidence "what was really agreed upon between the parties" (*id.*): namely, a policy providing excess insurance without an exclusion for work in residential

buildings.  Accordingly, the Excess Policy must be reformed such that it contains no exclusion for work in residential buildings.[11]

### 2.    Illusory Coverage

Under New York law, an illusory contract is "[a]n agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation" and is "unenforceable." *Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 684 (2017) (citation omitted).  "[A]n insurance policy is not illusory if it provides coverage for some acts" even if it is subject to a "potentially wide exclusion." *Id*. (citation omitted). "Insurance coverage is illusory where the insured purchases no effective protection." *Aspen Specialty Ins. Co. v. 4 NYP Ventures LLC*, 162 F. Supp. 3d 337, 345 (S.D.N.Y. 2016).  In *Lend Lease*, the New York Court of Appeals made clear that the "illusory coverage" principle is a narrow exception to the general rule that unambiguous contracts will be enforced, rejecting the policyholder's claim of illusory coverage where an exclusion did not "defeat *all* of the coverage afforded under the policy[]." *Lend Lease*, 28 N.Y.3d 675 at 685; *accord Hall v. Mountain Valley Indem. Co.*, No. 23-CV-2496, 2024 WL 4635329, at *3 (S.D.N.Y. Oct. 30, 2024).  Here, as this Court stated in its summary judgment opinion, this issue "requires determining whether enough of Systems 2000's work was residential such that a commercial-only policy would be illusory, and whether GuideOne was actually aware of those facts when it issued the Excess Policy." *GuideOne*, 2025 WL 1919393, at *6.

---

[11] GuideOne has also relied on the language of the Excess Policy reserving GuideOne's "right to refuse to follow any . . . change [made after the inception date of the policy] to the Scheduled Underlying Insurance, in which event this policy shall apply as if the changes had not been made."  (DX 12 at 10.)  However, this language is irrelevant given the Court's conclusions regarding mutual mistake and illusory coverage, which go to the formation of the Excess Policy and not any "change" to the Primary Policy.

As explained in the Court's Findings of Fact, the trial evidence established clearly and convincingly that *all* of Systems 2000's work was performed in residential buildings.  *See supra* section I.F.1.  Moreover, GuideOne knew that fact and intended to provide coverage for precisely that work when it issued the Excess Policy.  *See supra* section I.F.2.  With an exclusion for residential work—which neither GuideOne nor Systems 2000 intended—"the insured purchase[d] no effective protection" and its coverage was therefore "illusory."  *Aspen Specialty Ins. Co.*, 162 F. Supp. 3d at 345.

Because a residential-work exclusion would completely defeat coverage for Systems 2000 under the Excess Policy, enforcement of that exclusion results in illusory coverage. Accordingly, reformation of the Excess Policy is warranted on this ground as well.

## III.    Conclusion

On the basis of the foregoing Findings of Fact and Conclusions of Law, the Court finds by clear and convincing evidence that the Excess Policy issued by GuideOne to Systems 2000 for 2021-2022 clearly does not reflect the intent of the parties at the time of the agreement and reflects a mutual mistake insofar as it incorporates the Residential-Work Exclusion of the underlying Primary Policy.  The Court also finds that GuideOne's declination of coverage under the Excess Policy reflects a construction of the policy that would have provided illusory coverage to Systems 2000.

The Court concludes that, by virtue of the parties' mutual mistake and GuideOne's illusory coverage, reformation of the Excess Policy is required and warranted under New York law, such that the Residential-Work Exclusion is stricken from the Excess Policy notwithstanding its "follow form" character.

Accordingly, it is hereby ORDERED that judgment will be entered in favor of Systems 2000 and against GuideOne on GuideOne's claim for declaratory relief and on Systems 2000's counterclaim for declaratory relief.

The Court hereby DECLARES that GuideOne is required to afford coverage to Systems 2000 under the Excess Policy for claims arising from the March 23, 2021 Manhattan fire loss.

Because this determination renders moot the remaining claims against Travelers and BNC, those claims will be dismissed as moot.  Any cross-claims filed by the remaining parties will be dismissed without prejudice to the assertion of any claims pending in other actions.

The parties shall confer and, by January 16, 2026, shall submit a joint status letter with a proposed judgment and/or a proposed schedule for resolution of any remaining disputes among the parties, including with respect to attorney's fees and costs.

SO ORDERED.

Dated:  December 22, 2025
        New York, New York

_____
            J. PAUL OETKEN
        United States District Judge